Demarest *v.* Vandenberg.

## GARRET DEMAREST

*v.*

## AALT VANDENBERG et al.

1. A rule to bar creditors will protect the executors of the surety of a mortgagor, and the administrators of his deceased widow, to whom he had devised lands for her lifetime or widowhood, from liability for a decree of deficiency, after the foreclosure of the mortgage; and a discharge in bankruptcy will protect a grantee of part of the mortgaged premises, who personally assumed the payment of the mortgage as part of the consideration of his conveyance.

2. Where a son acted as the agent of his father in negotiating a loan by the latter on bond and mortgage, and, with his knowledge and consent, received a bonus therefor from the mortgagor, his alleged services consisting in inducing his father to make the loan, the father is chargeable with the bonus as usury.

Bill to foreclose. On final hearing on pleadings and proofs.

*Mr. W. Prall*, for complainant.

*Mr. J. W. Griggs,* for defendants.

THE CHANCELLOR.

This is a suit to foreclose a mortgage given by Aalt Vanden-berg and his wife to Garret Demarest, May 4th, 1869, upon land in Passaic county, to secure the payment of $7,000 in two years from its date, with interest at seven per cent. per annum, pay-able semi-annually, according to the condition of a bond of the same date, given to Demarest by Vandenberg, with Cornelius Van Winkle as surety. Nothing has been paid on account of the principal. The interest has been paid up to May 1st, 1875. Van Winkle is dead. He left a will, by which he gave to his wife $5,000, and devised to her certain real estate in Paterson for life or during her widowhood, with remainder in fee to his daughter, Ann Elizabeth Romaine, to whom he gave that real estate at once, in case his wife should predecease him. He also devised certain other real property in Paterson to his son, Simon P. Van Winkle, in fee, and gave the residue of his property, in equal shares, to Simon and Ann Elizabeth absolutely. His executors were his son, Simon P. Van Winkle, and Socrates Tuttle, who is now deceased. They both proved the will. In the progress of the settlement of the estate, they obtained a decree March 14th, 1874, barring creditors from claims against them as executors. Mrs. Van Winkle, the testator's widow, survived her husband, and died intestate in 1879. Her admin-istrators were her son, the before-mentioned Simon P. Van Winkle, and Helmas Romaine, husband of her daughter Ann Elizabeth. They obtained, in September, 1880, a decree barring creditors from claims against them as administrators. After he gave the complainant's mortgage, Vandenberg sold, on April 12th, 1872, to Nehemiah Millard, part of the mortgaged prem-ises, and, on the 1st of May, in that year, sold the rest of the property to Albert M. Bigelow, who assumed the payment of the complainant's mortgage as part of the consideration of the deed to him. Bigelow was adjudged a bankrupt on April 1st, 1879, and thereby discharged from all debts provable against his estate which existed May 1st, 1878. The bill prays decree for

deficiency against the executors of Cornelius Van Winkle, deceased, the administrators of his widow and Simon P. Van Winkle, and Ann Elizabeth Romaine, as heirs-at-law and devisees of Cornelius Van Winkle, deceased. The executors and administrators have set up the decrees barring creditors obtained by them. Those decrees protect them from liability for deficiency in this suit, and his discharge in bankruptcy protects Bigelow. The devisees of Cornelius Van Winkle are liable. By the will there was specifically devised to Simon land in Paterson of the value of $22,500, and to Ann Elizabeth land in this state of the value of $7,500, and under the residuary clause there passed to each of them, by devise, land in this state of the value of over $55,000. The personal estate was more than sufficient to pay the debts which were proved.

The only question discussed at the hearing was the question of usury. The loan was made by the complainant to Vandenberg in 1869. Breen, a friend of the latter, in his behalf, applied to the complainant for a loan of $7,000. The complainant said that he had the money, but that his son Garret did his business and Breen must see him. Breen then went accordingly to see the son, who was a clerk in a grocery store in Paterson, and asked him if he had the money to put out on bond and mortgage for his father, and the son told him in reply that they would let Vandenberg have the money—$7,000—provided he would pay ten per cent. bonus. To which Breen said that Vandenberg would take the money. Breen reported the matter to Vermeulen, who also was a friend of Vandenberg's, and lived and kept a store in Paterson. Vandenberg lived out in the country and Breen, therefore, left word for him with Vermeulen, so that he might know, when he should come into town, what had been done. The transaction was completed and the money paid over in Vermeulen's office. He was present. The complainant gave to Vandenberg the whole of the $7,000. Vermeulen says that, as to the ten per cent., the complainant said he did not want that money but " wanted it to be given to his son Garry—that it had to be given to his son Garry." He also says that he thinks the complainant made a remark that he " would

not have the $700, but gave it to his son Garry." An effort was made to cast discredit upon Vermeulen's statements by the testimony of other witnesses who were present on that occasion, and by the testimony of the complainant's son, but although they contradict him in some respects, the contradictions do not deprive his testimony of weight. He is a disinterested witness, who, according to the testimony of the complainant's son, took a very considerable part in the transaction as to which he testifies, while the other witnesses who were present had no interest in it at all, and, under the circumstances, can scarcely be expected to remember as accurately as he what transpired after so great a lapse of time—over seventeen years. The complainant, who has, since the transaction under consideration, become insane, was, therefore, not sworn, and his disability precluded Vandenberg from being a witness in his own behalf. *Demarest* v. *Vandenberg, 12 Stew. Eq. 130, 13 Stew. Eq. 341.* It appears, from the son's testimony, that the complainant knew before the transaction was completed that his son intended to charge a commission. He says his father asked him why he was so anxious to let Vandenberg have the money, and he told him he was to get a commission for letting Vandenberg have it. He says his father did not know the amount of the commission which he was to receive, but his testimony upon that head is evasive. When asked whether he, at the time when the money passed from his father to Vandenberg, or at any time previous thereto, informed his father that Vandenberg had agreed to give him ten per cent. for his services, he replied, " No, sir; not in that way." To the question " Did you ever inform your father whether Vandenberg had agreed to give you any specific sum for your services ? " he answered, " There never was any sum named." He says, however, that his father knew he received something, but adds that he did not know how much. It is quite improbable that his father did not know what premium Vandenberg had agreed to give to him for the loan of the money. It appears that he had invested for his father two other sums of money previously, upon one of which he had received a premium of ten per cent., and on the other not quite so much. He says that, at about the time

when the loan to Vandenberg was made, and for a long time previously thereto, it was customary in Paterson to get ten per cent. as a bonus or commission for a loan of money.

The complainant referred Mr. Breen to his son as his agent, and the son acted for him because, as the latter says, his father was, at that time, not in very good bodily or mental health. He says his father relied chiefly on him and his brother-in-law, Cornelius A. Cadmus, to attend to his affairs. It appears, however, that the complainant, in fact, attended to this business himself. He required security upon the bond and himself paid over the money for the mortgage. But it is proved that his son was his agent in this matter, and, with his knowledge and consent, received a bonus for the loan of the money at lawful interest. If Vermeulen is to be believed (and I see no reason to doubt his sincerity or the accuracy of his recollection in this matter), the complainant not only knew what the amount of the bonus was, but expressly declined to retain it, saying that it must be paid to his son. As before stated, Vermeulen says he thinks the complainant made the remark that he would not have the $700, but gave it to his son. The son relied upon Vermeulen, who, he says, had had a great deal to do and say about the matter, to get the $700 for him. He says that the reason why he did not go and get the money himself when the loan was made, was that he could not get away from the store in which he was employed, as his employer was away and it was a very busy day. It seems that but for this he would have gone to Vermeulen's place of business when the loan was made, and would there have received the $700. The son really rendered no service in the matter for which he was entitled to $700 from anybody. He was a clerk, upon a salary, in a grocery store, and was twenty-seven years old. But whatever services he rendered, he rendered for his father, whose agent he was. He was not the borrower's agent, although he claims that he earned the commission of $700 by inducing his father to make a loan which he was not disposed to make because he thought it unsafe. He says that the service for which he was to charge Vandenberg ten per cent. was the endeavor to get the money for him; that his father

objected to putting the money out upon a farm in the country; that he (his father) thought it was not safe, and he (the son) used his influence with him to let Vandenberg have the money. He also says that it was after he urged the matter for some time that his father agreed to let the money go upon the security. But he was his father's agent, and it was he who was to be satisfied with regard to the sufficiency of the security and as to whether it would be prudent to make the loan. It was a direct violation of his duty to act as agent for the borrower in overcoming the objections of his father to making the loan, and the violation appears all the more flagrant when it is considered that, according to his own testimony, he, when acting as agent for his father, did not hesitate to undertake, in consideration of $700, to act for the other side, contrary to his father's interest; that is, for that consideration, to induce his father to make a large loan, which, but for that consideration, he, to say the least of it, would not have urged him to make. It is quite plain that the reasons which he gives for demanding the bonus are but the considerations presented by the lender as an excuse for demanding a premium upon the loan. The complainant is chargeable with the payment to his son. This case is not within the case of *Muir* v. *Newark Savings Institution, 1 C. E. Gr. 537,* for here the principal had knowledge of the act of the agent and consented to it. It would seem that in this case the lender referred the borrower to his son merely in order that thus a premium for the benefit of his son, if not for himself, might be secured. The case is similar to the Trefz case (*13 Stew. Eq. 502*), recently decided in this court, and is governed by the same principles. The defence of usury is established. The executors and administrators are entitled to costs.